IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | |
|---|---|
| VICTOR K. CONNER, K. AUSTIN CONNER, and JESSICA CONNER, | : |
| | : |
| | : |
|    Plaintiffs, | : |
| | : |
|    v. | : |
| | :     No. 5:21-CV-55 (CAR) |
| CITY OF CENTERVILLE, GA; | : |
| CENTERVILLE POLICE CHIEF | : |
| CHARLES HADDEN; WESLEY | : |
| NEESMITH, individually and in his | : |
| Capacity as Centerville Police Officer; | : |
| and DAMIR MEHMEDIC, | : |
| individually and in his capacity as | : |
| Centerville Police Officer; | : |
| | : |
|    Defendants. | : |
| _____ | : |

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Victor Conner, his son Austin Conner, and his wife Jessica Conner filed this civil rights action against the City of Centerville, Georgia ("the City"), former Centerville Police Chief Charles Hadden ("the Police Chief"), and Centerville Police Officers Wesley Neesmith and Damir Mehmedic (collectively, "the Officers") after Victor, a passenger in the truck his son Austin was driving, was tased and arrested during a traffic stop. Defendants now seek summary judgment. After careful consideration, the Court **GRANTS** Defendants' Motion for Summary Judgment [Doc. 24]**.**

1

## BACKGROUND

This lawsuit arises from a traffic stop of a vehicle driven by Plaintiff K. Austin Conner and the subsequent tasing and arrest of his father and passenger, Plaintiff Victor Conner.  The following facts are viewed in the light most favorable to Plaintiffs as the nonmoving parties. There are three sets of video footage that captured the stop and subsequent events—Officer Neesmith's dash camera, Officer Neesmith's body camera, and Officer Mehmedic's body camera. "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[1]

Just before 1:00 a.m. on May 22, 2019, City of Byron Police Officer Kyle Wood alerted Defendant City of Centerville Police Officer Wesley Neesmith that he had observed a black Toyota Tundra failing to maintain its lane of travel heading toward the City of Centerville, outside of Officer Wood's jurisdiction.[2] Officer Wood followed the Toyota Tundra into the City of Centerville until Defendant Officer Neesmith was able to locate the truck.[3] Upon driving up behind the truck, Officer Neesmith observed—and his dash camera footage confirms—the black Toyota Tundra cross the center line of the

---

[1] *Scott v. Harris*, 550 U.S. 372, 380 (2007).
[2] Wood Aff. ¶¶ 3-6 [Doc. 24-9]; Neesmith Dep., pp. 32-35 [Doc. 34]; Neesmith Body Cam 00:17-00:33.
[3] Wood Aff. ¶ 5.

truck's lane of travel.[4] Thus, Defendant Neesmith activated his blue lights to initiate a traffic stop.

Sixteen-year-old Plaintiff Austin Conner was driving the truck, and his father, Plaintiff Victor Conner, was a passenger in the front seat. Austin had a learners permit and was not licensed to drive without supervision. Austin was driving to his ex-girlfriend's house to drop off a jacket because the two had just broken up.[5]

When Officer Neesmith activated his blue lights, the truck slowed but did not immediately stop. Officer Neesmith intermittently activated his sirens, called in the stop to dispatch, and advised the dispatcher that the vehicle was still rolling.[6] Approximately 90 seconds after Neesmith activated his blue lights, the truck stopped in the Belk department store parking lot.[7] Defendant Centerville Police Officer Damir Mehmedic also responded to the scene to provide backup.[8] Both Officers were carrying tasers and had received training in taser use through their Georgia Peace Officer Standards and Training (P.O.S.T.) Council.[9]

While Officer Mehmedic was on his way, Officer Neesmith approached the truck from the rear driver's side and knocked on the driver's side back passenger rear

---

[4] Neesmith Dep., p. 34; Neesmith Dash Cam at 00:27.
[5] Austin Dep., pp. 35-36 [Doc. 26-3].
[6] Neesmith Dash Cam at 00:29-00:54.
[7] *Id.*
[8] Mehmedic Dep., p. 21 [Doc. 33].
[9] Training materials, Ex. E [Doc. 24-3].

window.[10] Austin rolled down his front driver's side window.  Neesmith asked, "How are you doing, sir?" and instructed him to "[l]et your back window down for me."[11] The rear passenger side window remained rolled up. Neesmith asked two more times for Austin to roll down the back window, but the window remained rolled up.[12] Neesmith then approached Austin's open driver window and asked to see both Austin's and his father Victor's hands. Victor, seated in the passenger seat, had opened the glove compartment and explained that he was retrieving his insurance card. Neesmith responded to Victor, "I understand, but don't be reaching for nothing. I was telling [Austin] to let the back window down. I can't see nothing before I approach the vehicle okay. That's why I was telling him to let the back window down for me," and Neesmith tapped on the back driver-side window.[13] Victor responded that most back windows do not roll down, and Neesmith stated that most back windows do, in fact, roll down.[14] Victor explained in his deposition that he believed Neesmith was referring to the truck's rear windshield, not the rear driver's side window.[15] The rear windows remained rolled up.

---

[10] Neesmith Body Cam at 2:23.

[11] *Id.* at 2:27.

[12] *Id.* at 2:35, 2:41.

[13] *Id.* at 2:59-3:07.

[14] *Id.* at 3:07-3:09.

[15] Victor's Dep., p. 29 [Doc. 26-4].

Neesmith then asked to see Austin's driver's license and explained that he initiated the stop for failure to maintain lane because Austin was "all over the roadway."[16] When Neesmith asked why he failed to maintain his lane, Austin responded that it wasn't his vehicle and twice stated, "You can check me, I'm not high."[17] While Neesmith was speaking with Austin and his father, Defendant Officer Mehmedic arrived on the scene and positioned himself at the rear passenger's side of the truck.[18]

Neesmith took Austin and Victor's drivers licenses, insurance, and registration and walked away from the truck toward Officer Mehmedic. As he approached, Officer Mehmedic asked Neesmith to request the driver to roll down both of his passenger side windows.[19] Neesmith walked back to the truck and instructed Austin to roll down the rear passenger windows "so my partner can see." In response, the front passenger window was rolled down but not the rear passenger windows.[20] Neesmith, standing at Austin's driver's side window, asked three more times for the back windows to be rolled down and twice explained that they needed to be rolled down for officer safety.[21]

Officer Mehmedic also instructed Victor to roll the rear windows down. First, he asked Victor to roll the back window down from his position at the rear of the truck.

[16] Neesmith Body Cam. at 3:39, 4:36.
[17] *Id*. at 3:41, 4:23, 4:41.
[18] *See, generally* Mehmedic Body Cam.
[19] Mehmedic body cam at 2:24.
[20] *Id.* at 2:35.
[21] Neesmith Body Cam at 4:51-5:27.

5

When nothing happened, Mehmedic approached the front passenger side open window and stated directly to Victor, "Sir, for officer safety, roll down all four of your windows please."[22] The back windows were then rolled down. Mehmedic thanked Victor, stated, "they are heavily tinted, and we can't see inside. That's all we need. Stand by."[23]

Neesmith then convened with Mehmedic at the rear of the truck to discuss his concerns about Austin's unprompted statement that he was "not high," Austin's generally delayed responses to his questions, and his failure to maintain lane.[24] Neesmith explained that he did not smell any alcohol or marijuana. Because neither Neesmith nor Mehmedic were trained drug recognition experts (DRE), Mehmedic radioed dispatch to see whether a DRE was available to come to the scene.[25] Neesmith then returned to his patrol car to run the drivers' licenses and insurance information and write a citation for failure to maintain lane.[26] Mehmedic remained positioned at the rear passenger's side of the truck.

While Neesmith was checking the licenses and insurance and writing the citation, the rear windows of the truck were rolled back up.[27] Mehmedic ordered Victor, "Do not roll that window up. Roll it down."[28] The window rolled back down. Mehmedic thanked

---

22 Medmedic Body Cam at 2:37-3:05.
23 *Id.* at 3:14.
24 Neesmith Body Camp at 5:51-8:35.
25 *Id.*; Mehmedic Dep., pp. 29-31.
26 Neesmith Body Cam at 8:35.
27 Mehmedic Body Cam at 6:43.
28 *Id.*

Victor. In response to some words from Victor that cannot be discerned from the audio on the video footage, Mehmedic told him three times to "just stand by" and to "be patient."[29]

One minute later, the back window was rolled back up.[30] "Once again," Mehmedic ordered, "do not roll up your back window. I'm not going to tell you again. Roll it down please."[31] The windows remained rolled up. Ten seconds later, Mehmedic ordered Victor six more times to roll down the back window, to which Victor refused, and warned Victor he would be arrested for obstruction if he did not comply:

| | |
|---|---|
| Mehmedic: | Sir, roll down your back window.[32] |
| Victor: | This is personal property, you can't tell me to-- |
| Mehmedic: | Sir, you need to roll down your window so I can see what's going on. |
| Victor: | I'm not. |
| Mehmedic: | Roll down the window sir, or you will be placed under arrest for obstruction. |
| Mehmedic: | Roll down the window. |
| Mehmedic: | Roll down the window sir. |
| Mehmedic: | Roll down the window sir. [33] |

At this point, Plaintiffs had been stopped for six minutes and 36 seconds; the Officers had ordered that the back windows be rolled down 18 times; Plaintiffs had been told the windows needed to be down for the Officers' safety; Plaintiffs had been told not

---

[29] *Id.* at 7:15-7:24.
[30] *Id.* at 8:24.
[31] *Id.*
[32] *Id.* at 8:34.
[33] *Id.* at 8:41-8:52.

to roll the windows up; and Victor had been warned he would be arrested for obstruction if he did not comply. Victor did not comply, and the back windows remained rolled up.

Thus, Officer Mehmedic approached the truck, opened the passenger door, and ordered Victor to "step out of the vehicle."[34] Victor responded, "You can't do that," and did not exit the vehicle.[35] Meanwhile, Officer Neesmith was seated in his patrol car running Plaintiffs' licenses and insurance and was starting to write a citation when he overheard the confrontation, exited his vehicle, and came to assist Mehmedic.[36]

For the next 47 seconds, the Officers ordered Victor to exit the truck at least 20 times. Victor refused to exit the vehicle and actively resisted the Officers' attempts to pull him out of the truck upon his refusals: he shook his head no; he pulled his arm back when the Officers tried to physically pull him out of the vehicle; and he repeatedly stated, "this is my personal property," and "you cannot do this." The Officers warned Victor three times he would be tased if he did not exit the vehicle.[37] Victor did not exit the vehicle.

---

[34] *Id.* at 8:57.
[35] *Id.* at 8:58.
[36] Neesmith Body Cam 8:26-11:17; Mehmedic Body Cam 9:15-9:20; Neesmith Dep., pp. 25-26.
[37] Neesmith Body Cam 11:24-12:17; Mehmedic Body Cam 8:57-9:44.

Officer Mehmedic then deployed his taser on Victor in "drive stun" mode without deploying the prongs.[38] Officer Neesmith also attempted to deploy his taser in drive stun mode, but neither officer knows whether the taser contacted Victor.[39] When Neesmith attempted to deploy his taser, the Officers believed Victor grabbed Neesmith's taser with his hand. During the struggle, Neesmith stated, "He's got my taser."[40] Officer Mehmedic then drew his gun and stated to Victor, "If you don't stop grabbing the taser you will be shot. Step out of the vehicle. Right now. Step out of the vehicle right now. Step out of the vehicle. Step out of the vehicle."[41] Victor did not exit the truck. Seventeen seconds later, Mehmedic re-holstered his firearm.[42]

Victor remained seated in the vehicle, began dialing a number on his cell phone, and stated, "Nope. I'm calling my lawyer."[43] Officer Neesmith ordered Victor to step out of the vehicle two more times.[44] Victor remained seated and again stated, "I'm calling my

---

[38] Mehmedic Body Cam 9:44; Mehmedic Dep., pp. 43-44 ("I deployed . . . what's called the drive stun, which is just a contact, a touch discharge, which is just a momentary -- . . . . It doesn't deploy the prongs of the taser. . . . It's designed to elicit what's called pain compliance through involuntary muscle spasms of the voluntary muscles.").

[39] Neesmith Dep., p. 63; Mehmedic Dep., p. 43.

[40] Mehmedic Boday Cam 9:54-9:57; Neesmith Dep., p. 63; Mehmedic Dep., pp. 43-44.

[41] Neesmith Body Cam 12:24-12:35; Mehmedic Body Cam  10:04.

[42] Mehmedic Body Cam 10:21.

[43] Neesmith Body Cam 12:46; Mehmedic Body Cam 10:25.

[44] Neesmith Body Cam 12:49.

lawyer."[45] Neesmith responded, "You can call your lawyer in just a little while. Step out."[46] The Officers continued to try and gain Victor's compliance by pulling him out of the vehicle, but Victor did not comply, and a struggle ensued.[47] Victor asked, "What have I done wrong?"[48] The Officers continued to order Victor out of the vehicle, and Mehmedic appealed to Victor, "We're trying to make this as easy as possible. We don't want to hurt you. Get out of the car."[49] Victor remained seated in the truck.

At this point, Victor had overtly refused to comply with at least 45 commands to exit the vehicle and had actively resisted being pulled out of the truck. Officer Neesmith then placed his hands on Victor's neck in what Plaintiffs characterize as a "chokehold" and attempted to pull him from the vehicle. Austin expressed concern that Neesmith was choking his father, and Neesmith said, "Ain't nobody choking him. My hand's not around in front of your neck."[50] During the time Neesmith had Victor in the "chokehold," Victor can be heard clearly stating, "This is my personal property. You cannot do this."[51] After 10

---

[45] Neesmith Body Cam 12:50.
[46] *Id.*
[47] Neesmith Body Cam 12:56-13:30.
[48] *Id.* at 13:16.
[49] Mehmedic Body Cam 13:34.
[50] Neesmith Body Cam 13:52-13:56.
[51] Mehmedic Body Cam 11:38.

seconds, Neesmith backed away and can be clearly seen with his hands no longer on Victor's neck.[52]

The Officers continued to try and pull Victor out of the car and Victor resisted.[53] Mehmedic warned him for the fourth time, "You are about to get tased," and Victor, still seated in the passenger seat, responded, "You've already tased me twice."[54] For the next 90 seconds, the Officers ordered Victor to step out of the vehicle at least 15 more times and continued trying to pull him out of the vehicle. Victor resisted being pulled out and picked up his cell phone stating that he intended to call the Houston County Sheriff's Office. Mehmedic warned Victor that if he did not exit the vehicle, he would "get the prongs."[55] Victor refused to exit and put the phone up to his ear while the Officers attempted to pull him out of the truck.[56] Victor resisted the Officers' attempts by pulling his arm away,[57] and Mehmedic implored Victor to "stop resisting,"[58] to which Victor responded, "Resisting my ass."[59]

---

[52] Neesmith Body Cam 14:02.
[53] *Id.*
[54] *Id.* at 14:03.
[55] *Id.* at 14:08.
[56] *Id.* at 14:22.
[57] Neesmith Body Cam at 14:24-28
[58] *Id.* at 14:29.
[59] *Id.* at 14:32.

After more commands to exit, Mehmedic deployed his taser, but the prongs did not connect to Victor.[60] The Officers continued attempting to pull Victor out of the truck and instructing him to exit, but Victor responded, "No. I'm not. No. I'm not."[61] After more than 50 commands and three minutes and 30 seconds after first ordering Victor to exit the truck, Mehmedic deployed his taser, and the prongs connected to Victor. Victor slumped over and fell out of the truck.[62]

After Victor was tased, the Officers ordered him to roll over and give them his hands, whereupon they placed him in handcuffs. Less than six minutes after he was tased, Victor can be seen on video footage laying on the ground in handcuffs with his head raised talking to police officers who arrived on the scene.[63] Less than nine minutes after being tased, Victor can be seen sitting up talking to the officers.[64] Victor was transported to the Houston County Jail, where he was charged with misdemeanor obstruction pursuant to O.C.G.A. § 16-10-24(a) and felony attempt to remove a less-lethal device pursuant to O.C.G.A. § 16-10-33.[65]

---

[60] Neesmith Body Cam at 14:55; Mehmedic Body Cam at 12:33.
[61] *Id.* at 14:55; Mehmedic Body Cam at 12:33.
[62] Neesmith Body Cam 15:08; Mehmedic Body Cam 13:05.
[63] Neesmith Dash Cam 19:58; Mehmedic Body Cam at 19:17.
[64] Neesmith Dash Cam at 22:26; Mehmedic Body Cam at 20:20.
[65] Victor's charges remain pending in Houston County Superior Court.

Austin was ordered to exit his vehicle by other law enforcement officers and was briefly detained while officers secured the scene and took Victor into custody.[66] Austin was released to a relative on the scene and issued a ticket for failure to maintain lane.[67]

The taser prongs struck Victor in the right torso and right upper thigh.[68] Victor alleges he lost consciousness and was later diagnosed with having suffered a heart attack based on elevated cardiac enzymes.[69]

Plaintiffs filed suit asserting federal claims for violations of the Fourth, Fifth, Eighth, and Fourteenth Amendments under 42 U.S.C. § 1983 against all Defendants; state law claims for false arrest, assault and battery, false imprisonment, and intentional infliction of emotional distress against the individual Officers; and failure to train and supervise and negligent hiring and retention against the City and former Chief Hadden. Plaintiff Jessica Conner, Victor Conner's wife, asserts a claim for loss of consortium. Defendants have moved for summary judgment.

## LEGAL STANDARD

Summary judgment is proper if the movant "shows that there is no genuine

---

[66] Austin Dep., pp. 72-73; Neesmith Dash Cam at 15:48; Mehmedic Dash Cam at 13:29.
[67] Austin Dep., pp. 72-73.
[68] Mehmedic Dep., pp. 50-52.
[69] Victor Dep., pp. 48-52.

dispute as to any material fact and the movant is entitled to judgment as a matter of law."[70] The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and that entitles it to a judgment as a matter of law.[71] If the moving party discharges this burden, the burden then shifts to the nonmoving party to go beyond the pleadings and present specific evidence showing that there is a genuine issue of material fact.[72]

The Court must view the facts, and any reasonable inferences drawn from those facts, in the light most favorable to the party opposing the motion.[73] "The inferences, however, must be supported by the record, and a genuine dispute of material fact requires more than 'some metaphysical doubt as to the material facts.'"[74] In cases where opposing parties tell different versions of the same events, and one is "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should

---

[70] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[71] *Catrett*, 477 U.S. at 323 (internal quotation marks omitted).
[72] *See* Fed. R. Civ. P. 56(e); *see also Catrett*, 477 U.S. at 324-26.
[73] *Penley v. Eslinger*, 605 F.3d 843, 848 (11th Cir. 2010); *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992).
[74] *Logan v. Smith*, 439 F. App'x 798, 800 (11th Cir. 2011) (quoting *Penley*, 605 F.3d at 848).

not adopt that version of the facts."[75]   A disputed fact will preclude summary judgment only "if the dispute might affect the outcome of the suit under the governing law."[76] "The court may not resolve any material factual dispute, but must deny the motion and proceed to trial if it finds that such an issue exists."[77]

## DISCUSSION

### I.    Federal Law Claims Under 42 U.S.C. § 1983

Section 1983 does not itself create any substantive rights.[78] Instead, it provides a vehicle through which individuals may seek redress when their federally protected rights have been violated by someone acting under color of state law.[79] Both municipalities and individuals are subject to suit under section 1983.[80]

Plaintiffs assert § 1983 claims against Officers Neesmith and Mehmedic in their individual and official capacities under the Fourth, Fifth, Eighth, and Fourteenth Amendments for unlawful seizure, unlawful arrest, and excessive force; they also assert § 1983 supervisory and municipal liability claims against the former Police Chief and the City of Centerville for maintaining a policy or custom of hiring, retaining, supervising,

---

[75] *Pourmoghani-Esfahani v. Gee*, 625 F.2d 1313, 1315 (11th Cir. 2010) (per curiam) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

[76] *Id.* (internal quotation marks omitted).

[77] *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

[78] *Baker v. McCollan*, 443 U.S. 137, 140, 144 n.3 (1979).

[79] *Graham v. Connor*, 490 U.S. 386, 393-94 (1989).

[80] *Floyd v. City of Miami Beach*, 730 F. App'x 838, 841 (11th Cir. 2018).

and failing to train officers like Neesmith and Mehmedic. As explained below, Defendants are entitled to summary judgment on each of Plaintiffs' claims.

## A. Abandoned Claims

Plaintiffs failed to respond to or otherwise address Defendants' arguments in favor of summary judgment for Plaintiffs' (1) official capacity claims against Defendants NeeSmith and Mehmedic; (2) Fourth and Fourteenth Amendment claims for wrongful arrest; (3) Fifth and Eighth Amendment claims; and (4) municipal and supervisory liability against the City and the Police Chief. "In opposing a motion for summary judgment, a party may not rely on his pleadings to avoid judgment against him."[81] "[T]he onus is on the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned."[82] Thus, Plaintiff has abandoned these claims.[83] But as explained below, even if Plaintiff had not abandoned these claims, the claims would fail on their merits.

## B. Individual Officers Shielded by Qualified Immunity

---

[81] *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) (citation and internal quotation marks omitted).

[82] *Id.* (citation omitted); *see also Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("Failure to brief and argue [an] issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.").

[83] *See Clark v. City of Atlanta*, 544 F. App'x 848, 855 (11th Cir. 2013) (holding that district court "properly treated as abandoned [the plaintiffs' claims], which were alleged in the complaint but not addressed in opposition to the motion for summary judgment.").

Officers NeeSmith and Mehmedic are entitled to qualified immunity on Plaintiff's Fourth Amendment unlawful seizure and excessive force claims.

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[84] When an officer invokes qualified immunity, the initial burden is on the officer to show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred.[85] A defendant acts within the scope of his discretionary authority if the allegedly wrongful acts were undertaken pursuant to the performance of his or her duties and within the scope of his or her authority.[86] Neither party disputes that the Officers were acting within their discretionary authority. Thus, the burden shifts to Plaintiffs to show the Officers violated Plaintiffs' clearly established constitutional rights.[87]

### 1. Fourth Amendment Unlawful Seizure Claim

### a. Traffic Stop

---

[84] *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted).

[85] *Lee v. Ferraro*, 284 F.3d 1188, 1194 (2002); *see also, Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019), cert. denied, (June 15, 2020) (Although "the defense of qualified immunity is typically addressed at the summary judgment stage of a case, it may be raised and considered on a motion to dismiss.").

[86] *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998).

[87] *Pearson v. Callahan*, 555 U.S. 232 (2009).

Plaintiffs contend the traffic stop was unlawful under the Fourth Amendment because Officer Neesmith had no reasonable suspicion to initiate the stop.[88] The Court disagrees.

The Fourth Amendment protects individuals from "unreasonable searches and seizures."[89] A traffic stop "constitute[s] a 'seizure' within the meaning" of the Fourth Amendment.[90] "A traffic stop is constitutional if the officer had reasonable suspicion to believe the criminal activity has occurred, is occurring, or is about to occur."[91] "In other words, an officer making a stop must have a particularized and objective basis for suspecting the person stopped of criminal activity."[92] "Even minor traffic violations qualify as criminal activity."[93]

---

[88] In their response brief, Plaintiffs summarily state, without further argument or analysis, that the traffic stop's duration was unconstitutional. [Doc. 29, p. 12]. Even assuming a challenge to the duration of the stop is properly before the Court, the video evidence conclusively establishes the stop was not prolonged. A traffic stop "become[s] unlawful if it is prolonged beyond the time reasonably required to complete [its] mission." *Illinois v. Caballes,* 543 U.S. 405, 407 (2005). In *Rodriguez,* the Supreme Court "stated that a stop's legitimate mission has two components: (1) 'address[ing] the traffic violation' and (2) 'attend[ing] to related safety concerns." *Baxter v. Roberts,* 54 F.4th 1241, 1259 (11th Cir. 2022) (citing and quoting *Rodriguez v. United States,* 575 U.S. 348, 350 (2015)). The "'related safety concerns' includes a traditional set of 'ordinary inquiries incident to the traffic stop': i.e., 'checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (quoting *Rodriguez,* 575 U.S. at 355). "These checks are important because they 'serve the same objective as enforcement of the traffic code: ensuring hat vehicles on the road are operated safely and responsibly." *Id.* (quoting *Rodriguez,* 575 U.S. at 355). Officer Neesmith was in the process of checking Plaintiffs' drivers' licenses and insurance and writing a citation when the subsequent events followed.
[89] U.S. Const. amend. IV.
[90] *Delaware v. Prouse,* 440 U.S. 648, 653 (1979).
[91] *Baxter v. Roberts,* 54 F.4th 1241, 1256 (11th Cir. 2022) (citing *United States v. Campbell,* 26 F.4th 860, 880 (11th Cir. 2022) (en banc)).
[92] *Id.* (citing *Campbell,* 26 F.4th at 880).
[93] *Id.*

"A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity."[94] Thus, "[w]hen an officer asserts qualified immunity the issue is not whether reasonable suspicion existed in fact, but whether the officer had *arguable* reasonable suspicion to support an investigatory stop."[95] To determine whether arguable reasonable suspicion existed, the Court must consider whether an official had reasonable suspicion as an "objective question viewed from the standpoint of a reasonable officer at the scene . . . based on the totality of the circumstances[.]"[96]

Here, Officer Neesmith had a particularized and objective basis to stop Plaintiffs' truck for failure to maintain lane. Byron Police Officer Kyle Wood observed the truck failing to maintain its lane of travel and crossing over the center line of its lane of travel after midnight.[97] Officer Wood alerted Officer Neesmith of the vehicle's infractions. When Neesmith caught up with the truck, he personally witnessed the vehicle failing to maintain its lane of travel as it crossed over the white-dashed lines into the other lane of travel,[98] and his dash camera plainly shows the vehicle crossing over the lines into the other lane of travel before Neesmith activates his blue lights.[99]

---

[94] *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir. 2000).

[95] *Id.* at 1166.

[96] *Hicks v. Moore*, 422 F.3d 1246, 1252 (11th Cir. 2005).

[97] Wood Aff. ¶¶ 3-6.

[98] Neesmith Dep., p. 34.

[99] Neesmith Dash Cam at 00:27.

19

Reasonable suspicion of a minor traffic violation alone is sufficient to justify a stop.[100] Georgia law requires a vehicle to "be driven as nearly as practicable entirely within a single lane and [that it] not be moved from such lane until the driver has first ascertained that such movement can be made with safety."[101] And when a vehicle, like Plaintiffs', crosses the line into another lane of travel only to return to the original lane, an officer has a sufficient basis to initiate a stop.[102]

Plaintiffs argue that a genuine issue of material fact exists as to whether Austin failed to maintain his lane. First, Plaintiffs point to Victor's testimony that Austin was "driving perfect" and never left his lane of travel, weaved, or crossed the line. Plaintiffs also point out that Austin had his learner's permit for only two months at the time of the incident and was driving especially cautious because a police vehicle was following him. Finally, Plaintiffs argue the video evidence is inconclusive given the distance between the vehicles, the glare from the streetlights, and the fact that the vehicles were in different positions relative to the slight left-hand curve of the road.

---

[100] *See United States v. Campbell*, 26 F.4th 860, 880 (11th Cir. 2022) (rapidly blinking turn signal provided reasonable suspicion to believe plaintiff violated a Georgia traffic law making traffic stop lawful).

[101] O.C.G.A. § 40-6-48(1).

[102] *See United States v. Clark*, 32 F.4th 1080 (11th Cir. 2022) (Defendant's weaving between lanes created probable cause that defendant had committed Georgia traffic infraction of failing to maintain lane justifying the stop even if officer could not later remember whether defendant crossed a fog line); *Camacho v. State*, 292 Ga. App. 120, 122 ("numerous cases have held that weaving out of one's lane of travel justifies a stop.") (citing cases).

But Plaintiffs' arguments are blatantly contradicted by Officer Neesmith's dash camera footage which plainly shows the truck crossing into the other lane of travel. As the Supreme Court has explained, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[103]

Here, there is no violation of the Fourth Amendment protection against unreasonable seizures because Officer Neesmith had reasonable suspicion to believe Austin violated Georgia's traffic laws for failure to maintain lane. Even if he did not have reasonable suspicion to initiate the stop, he certainly had arguable reasonable suspicion. Thus, qualified immunity shields Officer Neesmith from liability on Plaintiffs' Fourth Amendment unreasonable seizure claim.

### b. Arrest

Even if Plaintiffs had not abandoned their claim for Victor's unlawful arrest under the Fourth Amendment, the Officers would be entitled to qualified immunity. The existence of probable cause bars a Fourth Amendment false arrest claim under § 1983.[104] "Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to

---

[103] *Scott*, 550 U.S. at 380-81.
[104] *Marx v. Gumbinner*, 905 F.2d 1503, 1505-06 (11th Cir. 1990).

cause a person of reasonable caution to believe that a criminal offense has been or is being committed."[105] It requires only "that it be reasonable for any particular officer to conclude that there is a substantial chance of criminal activity."[106] Thus, "innocent behavior frequently will provide the basis for a showing of probable cause."[107] "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted—indeed for every suspect released."[108] And "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."[109]

"Even without actual probable cause, however, a police officer is entitled to qualified immunity if he had only 'arguable' probable cause to arrest the plaintiff."[110] Arguable probable cause requires only that "under all of the facts and circumstances, an officer reasonably <u>could</u>—not necessarily would—have believed that probable cause was present."[111] "This standard recognizes that law enforcement officers may make reasonable

---

[105] *Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 734 (11th Cir. 2010).
[106] *Illinois v. Gates*, 462 U.S. 213, 243 n. 13 (1983).
[107] *Id.*
[108] *Washington v. Howard*, 25 F.4th 891, 899 (11th Cir. 2022) (citing *Wesby*, 138 S.Ct. at 588).
[109] *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).
[110] *Gates*, 884 F.3d at 1298 (citing *Lee v. Ferraro*, 284 F.3d 1188 (11th Cir. 2002)).
[111] *Crosby*, 394 F.3d at 1332 (emphasis added).

but mistaken judgments regarding probable cause but does not shield officers who *unreasonably* conclude that probable cause exists."[112]

What is relevant for qualified immunity purposes is "the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."[113] It is an objective standard; the officer's underlying intent or motivation is irrelevant.[114] Whether an arresting officer possesses arguable probable cause "depends on the elements of the alleged crime . . . and the operative fact pattern."[115] Officers are insulated from false arrest claims "so long as probable cause existed to arrest the suspect for *some* crime, even if it was not the crime the officer thought or said had occurred."[116]

During a traffic stop, an officer can exercise "unquestioned command of the situation," including limiting the movement of occupants in ways that might jeopardize his safety.[117] "Officers routinely ask drivers to roll their windows down during traffic stops. This request is necessary to facilitate communication between the officers and the driver and it minimizes the threat to officer safety inherent in all traffic stops."[118] And an

---

[112] *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1137 (11th Cir. 2007).

[113] *Jones v. Cannon*, 174 F.3d 1271, 1283 n. 4 (11th Cir. 1999).

[114] *Lee*, 284 F.3d at 1195.

[115] *Skop*, 485 F.3d 1137-38 (internal citation omitted).

[116] *Williams v. Aquirre*, 965 F.3d 1147, 1158 (11th Cir. 2020).

[117] *Brendlin v. California*, 551 U.S. 249, 258 (2007).

[118] *United States v. Smith*, 2020 WL 5603668, at *2 (E.D. Cal. Sept. 18, 2020) (citing *Pennsylvania v. Mims*, 434 U.S. 106, 110 (1977)).

officer making a traffic stop may order passengers to get out of the car pending completion of the stop for officer safety.[119]

Here, the Officers certainly had arguable probable cause to arrest Victor for obstruction under Georgia law. Georgia law provides that "a person who knowingly and willfully obstructs or hinders any law enforcement officer . . . in the lawful discharge of his or her official duties shall be guilty of a misdemeanor."[120] "[V]iolence or forcible resistance is not required to prove that an officer was hindered or obstructed in a misdemeanor obstruction case. Argument, flight, stubborn obstinance, and lying are all examples of conduct that may satisfy the obstruction element."[121] "Showing arguable probable cause does not . . . require proving every element of a crime."[122] For purposes of the qualified immunity analysis, the Court looks "only to whether a reasonable officer, knowing what [Defendant] knew at the time, objectively could have believed that probable cause existed."[123] Victor repeatedly failed to obey Officer Mehmedic's lawful commands to roll down his windows and to exit the vehicle, and he physically resisted

---

[119] *Mims*, 434 U.S. at 110-11 (officer who directed a motorist stopped for a minor traffic violation to get out of his car, even though the officer had no reason to believe that motorist was dangerous or armed, did not violate the Fourth Amendment because the concern for the officer's safety outweighed the slight intrusion against the liberty of the motorist).

[120] O.C.G.A. § 16-10-24(a).

[121] *Pinchon v. State*, 237 Ga. App. 675, 675 (1999); *see also Stryker v. State*, 297 Ga. App. 493, 494 (2009) (clarifying that because force is no longer an element of misdemeanor obstruction, "words alone" can constitute obstruction).

[122] *Brown*, 608 F.3d at 735.

[123] *Id.* at 736 (emphasis added).

the Officers' efforts to get him out of the car. Thus, probable cause, and certainly arguable

probable cause existed to arrest Victor for obstruction.[124]

### 2. Fourth Amendment Excessive Force Claim[125]

Plaintiffs allege the Officers used excessive force when Officer Neesmith placed

Victor in a "chokehold" and when Victor was tased. As explained below, the Officers are

entitled to qualified immunity because their use of force did not violate Victor's clearly

established constitutional rights.

"[A]ll claims that law enforcement officers have used excessive force—deadly or

otherwise—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen

should be analyzed under the Fourth Amendment and its 'reasonableness' standard."[126]

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to

use some degree of physical coercion or threat thereof to effect it."[127] The Court views the

---

[124] *See Anthony v. Coffee Cnty*, 579 F. App'x 760 (11th Cir. 2014) (plaintiff's "refusal to comply with [officer's] instruction was, at least, misdemeanor obstruction" under Georgia law).

[125] In their Complaint, Plaintiffs allege that Defendants' actions violated their Fourth, Fifth, Eighth, and Fourteenth Amendment rights. But Plaintiff cannot maintain claims under the Fifth, Eighth, or Fourteenth Amendment. "[T]he Fifth Amendment due process clause applies only to the federal government"; *Mindler v. Clayton Cnty., Ga.*, 831 F. Supp. 856, 860 (N.D. Ga. 1993); the Eight Amendment's prohibition against cruel and unusual punishment protects individuals convicted of a criminal offense from the use of excessive force at the hands of government officials; *see Hudson v. McMillian*, 503 U.S. 1, 5 (1992); and the Fourteenth Amendment protects pretrial detainees from the use of excessive force, *see Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996). Because Victor's excessive force claims occurred during the investigatory stop/seizure and arrest, they are governed by the Fourth Amendment. *See Salvato v. Miley*, 790 F.3d 1286, 1293 (11th Cir. 2015).

[126] *Graham v. Connor*, 490 U.S. 386, 395 (1989).

[127] *Id.* at 396.

circumstances "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."[128]

"The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[129] To determine whether an officer used excessive force, the Court conducts a two-step inquiry. "First, [the Court] ask[s] whether the specific kind of force is categorically unconstitutional. Second, if the kind of force is not categorically unconstitutional, [the Court] then ask[s], weighing the factors set forth in *Graham*, whether the amount of force was excessive."[130]

"At summary judgment, [courts] cannot simply accept the officer's subjective version of events, but rather must reconstruct the event in the light most favorable to the non-moving party and determine whether the officer's use of force was excessive under those circumstances."[131] And "when 'opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it,' a court should not adopt the contradicted version for purposes of ruling on a motion for

---

[128] *Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015).

[129] *Graham*, 490 U.S. at 396-97.

[130] *Charles v. Johnson*, 18 F.4th 686, 699 (11th Cir. 2021) (citation omitted).

[131] *Fils v. City of Aventura*, 647 F.3d 1272, 1288 (11th Cir. 2011) (citation omitted).

summary judgment."[132] This is especially true "where videotape footage clearly contradict[s]" facts and testimony.[133]

"Determining whether the force used to effect a[n arrest] was objectively reasonable requires case-by-case 'balancing of "the nature and quality of the intrusion on the individual's Fourth Amendment interests" against the countervailing governmental interests at stake.'"[134] To do this, courts evaluate six factors:

> (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted.[135]

A defendant need not show that all the factors weighed in his favor for his use of force to have been objectively reasonable.[136] And "the calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."[137]

---

[132] *Singletary v. Vargas*, 804 F.3d 1174, 1183 (11th Cir. 2015) (citing *Scott v. Harris*, 550 U.S. 372, 380 (2007)).
[133] *Id.*
[134] *Stephens v. DeGiovanni*, 852 F.3d 1298, 1321 (11th Cir. 2017) (quoting *Graham*, 490 U.S. at 396).
[135] *Wade v. Daniels*, 36 F.4th 1318, 1325 (11th Cir. 2022) (citing *Mobley v. Palm Beach Cnty. Sheriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam)).
[136] *See Shaw*, 884 F.3d at 1099 n. 5; *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020) ("Not all of the factors are relevant to all excessive forces cases." (citation omitted)).
[137] *Graham*, 490 U.S. at 396-37.

Here, the Officers' use of tasers and hands-on techniques to effectuate Victor's arrest was reasonably proportionate to the situation they faced. The traffic stop occurred at 1:00 a.m. Victor refused to comply with at least 10 direct commands to keep the rear passenger windows rolled down for officer safety and ignored the warning he would be arrested for obstruction for his continued noncompliance. He then overtly refused over 50 commands to exit the truck, actively resisted the Officers' attempts to physically pull him out of the truck, and ignored five warnings he would be tased if he did not comply with their commands. Because Victor would not follow the Officers' commands, "there was a reasonable need for some use of force in this arrest."[138]

Plaintiffs' characterization that Officer Neesmith placed Victor in an unreasonable "chokehold" is refuted by the video evidence. While Neesmith was allegedly "choking" him, Plaintiff can be heard clearly stating, "This is my personal property. You cannot do this," and the hold lasted no more than ten seconds.[139] At the time Neesmith applied his hands on Victor's neck, Victor had refused at least 45 verbal commands to exit the vehicle, so it was objectively reasonable for Neesmith to attempt to use physical force for compliance.

The Officers' use of the taser was not clearly excessive under the circumstances. "The use of a taser is not categorically unconstitutional" and "can be appropriate in a

---

[138] *Draper*, 369 F.3d at 1278.
[139] Mehmedic Body Cam 11:38.

wide array of situations."[140] Here, the Officers were attempting to arrest Victor for obstruction. Victor was verbally and physically resisting their attempts to have him exit the truck. He repeatedly said "no" that he would not get out of the truck, and he actively pulled his arms away from the Officers when they attempted to pull him out of the truck. The Officers did not deploy the taser with prongs until three and a half minutes after the first command. In those three and a half minutes, Victor ignored more than 50 commands to exit the truck and was warned five times he would be tased. Plaintiff was not tased until after the Officers' attempts to use lesser force—verbal commands, physical removal, and use of the taser in drive stun mode—proved ineffective. To be sure "being struck by a taser gun is an unpleasant experience," but under the facts of this case, it was "reasonably proportionate to the need for force[.]"[141]

Plaintiffs' argument that qualified immunity does not apply in cases involving excessive force is without merit.[142] Plaintiffs' argument that Defendants' use of force was clearly constitutionally excessive because it was used when he was compliant, cooperative, under control, and otherwise subdued is also without merit. The videos

---

[140] *Charles*, 18 F.4th at 701.

[141] *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004).

[142] *See, e.g., Baker v. City of Madison, Alabama*, 67 F.4th 1268 (11th Cir. 2023) (qualified immunity to officers on plaintiff's claim for excessive force); *Charles v. Johnson*, 18 F.4th 686 (11th Cir. 2021) (same); *Tillis on behalf of Wuenschel v. Brown*, 12 F.4th 1291 (11th Cir. 2021) (same); *Hoyt v. Cooks*, 672 F.3d 972 (11th Cir. 2012); *Crenshaw v. Lister*, 556 F.3d 1283 (11th Cir. 2009); *Zivojinovich v. Barner*, 525 F.3d 1059 (11th Cir. 2008) (same).

establish that Victor was not cooperative or compliant with the Officers' lawful commands to exit his vehicle.

Because the Officers' use of force was not excessive, "it logically could not have been 'clearly established' or 'apparent' to the [Officers]" that the use of the "chokehold" or the taser was excessive.[143] "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted."[144] In other words, the issue is whether the law gave the officer "fair warning" that his conduct was unconstitutional.[145] When determining whether the law is clearly established, factually similar cases are "usually . . . needed to demonstrate that officials were fairly warned that their application of force violated the victim's constitutional rights."[146]

Plaintiff argues the facts in this case are similar to those in *Vinyard v. Wilson*[147] where the Eleventh Circuit denied officers qualified immunity after plaintiff was sprayed with pepper spray while handcuffed and seated in the back of a police car.[148] But in *Vineyard*, the plaintiff had not refused to comply with the officer's lawful commands or resisted arrest. The facts here are more like *Draper v. Reynolds*.[149] In that case, a police

---

[143] *Charles v. Johnson*, 18 F.4th 686, 701 (2021).
[144] *Saucier v. Katz*, 533 U.S. 194, 202 (2001).
[145] *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).
[146] *Willingham v. Loughnan*, 321 F.3d 1299, 1303 (11th Cir. 2003).
[147] 311 F.3d 1340 (11th Cir. 2002).
[148] *Id.* at 1343-44.
[149] 369 F.3d 1270 (11th Cir. 2004).

officer pulled over the plaintiff because the truck's tag light was not appropriately illuminated. During the stop, the plaintiff was "hostile, belligerent, and uncooperative," and when he failed to comply with the officer's fifth request to produce certain documents, the officer tased him.[150] The Eleventh Circuit held that the use of the taser "was reasonably proportionate to the difficult, tense[,] and uncertain situation that [the officer] faced in this traffic stop[ ] and did not constitute excessive force."[151] Thus, the Officers are entitled to qualified immunity.

## C.    Official Capacity Claims

Plaintiffs' claims against the Officers Neesmith and Mehmedic and former Chief Hadden in their official capacities must be dismissed because they are redundant of their claims against the City. "[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent. Such suits against municipal officers are therefore, in actuality, suits directly against the city that the officer represents."[152] Thus, all claims against the Officers and the former Chief of Police are hereby **DISMISSED** as redundant of Plaintiffs' claims against the City.

---

[150] *Id.* at 1273.

[151] *Id.* at 1278.

[152] *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) (citations and internal quotation marks omitted).

D.    **Municipal and Supervisory Liability Claims**

The Eleventh Circuit has repeatedly held that "[a] city or local government agency may not be held liable for constitutional deprivations on the theory of *respondeat superior*."[153] Instead, "to impose §1983 liability on a municipality, a plaintiff must show: (1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation."[154]

Similarly, "[i]t is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability. Instead, supervisory liability under § 1983 occurs either when the supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation."[155]

Here, because there has been no constitutional violation, there can be no municipal or supervisory liability on the City or former Chief Hadden. Moreover, Plaintiffs have pointed to no policies or customs of the City of Centerville's Police Department that

---

[153] *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1295 (11th Cir. 2000) (internal quotation marks and citation omitted).
[154] *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).
[155] *Christmas v. Harris County*, 51 F.4th 1348, 1355 (11th Cir. 2022) (citations and internal quotation marks omitted).

caused their alleged constitutional deprivations, and Plaintiffs have made no allegation the former Chief personally participated in the alleged unconstitutional conduct. Finally, Plaintiffs have set forth no evidence to support that the City or the former Police Chief failed to train or was negligent in hiring or retaining Officers Neesmith and Mehmedic.

## II.    State Law Claims

Plaintiffs also failed to respond to or otherwise address Defendants' arguments in favor of summary judgment on their state law claims for false arrest, assault and battery, false imprisonment, and intentional infliction of emotional distress against Officers NeeSmith and Mehmedic. But even if Plaintiffs had not abandoned these state law claims, they would fail.

The Georgia Constitution provides official immunity to State officials or employees who are sued for damages in their individual capacity when they (1) perform discretionary acts (2) in the scope of their official authority (3) without actual malice to cause the plaintiff any harm.[156] "A discretionary act . . . calls for the exercise of personal deliberation and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed."[157] And actual malice "requires a deliberate intention to do wrong, and denotes express malice or malice in fact. It does not

---

[156] *See Reed v. DeKalb County*, 264 Ga. App. 83, 86 (2003); Ga. Const. art. 1, 2, ¶9(d).
[157] *Marshall v. Browning*, 310 Ga. App. 64, 67 (2011).

include willful, wanton or reckless conduct or implied malice. Thus, actual malice does not include conduct exhibiting a reckless disregard for human life."[158]

Here, there is no evidence Officers Neesmith and Mehmedic maliciously intended to cause harm to Victor Conner. On the contrary, they pleaded with Victor for over three minutes to obey their commands stating that they did not want to cause any harm to him. Officer Mehmedic stated to Victor, "We're trying to make this as easy as possible. We don't want to hurt you. Get out of the car."[159] Thus, they are entitled to official immunity, and Plaintiffs' state law claims fail.

## CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment [Doc. 24] is **GRANTED**, and all claims are dismissed.[160]

**SO ORDERED,** this  28th day of March, 2024.

S/ C. Ashley Royal
C. ASHLEY ROYAL, SENIOR JUDGE
UNITED STATES DISTRICT COURT

---

[158] *Daley v. Clark*, 282 Ga. App. 235 (2006).

[159] Mehmedic Body Cam 13:34.

[160] Plaintiff Jessica Conner also brings loss of consortium claims for her husband's injuries. Because the Court dismisses her husband's underlying claims for injury against all Defendants, the Court also dismisses Jessica Conner's remaining loss of consortium claims.